Ben **GOLD**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 12352.

United States Court of Appeals
District of Columbia Circuit.

Order March 9, 1956.

Rehearing Denied April 12, 1956.

Opinion April 19, 1956.

Certiorari Granted Oct. 8, 1956.

See 77 S.Ct. 41.

Mr. Harold I. Cammer, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, and Mr. Joseph Forer, with whom Mr. David Rein, Washington, D. C., was on the brief, for appellant.

Mr. Joseph Lowther, Asst. U. S. Atty., with whom Messrs. Harold D. Koffsky and Brandon Alvey, Attorneys, Department of Justice, were on the brief, for appellee. Messrs. Leo A. Rover, U. S. Atty., at the time of argument and Lewis Carroll, Asst. U. S. Atty., also entered appearances for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, and BASTIAN, Circuit Judges.

Order

PER CURIAM.

This appeal came on to be reheard before the Court in banc on the transcript of the record from the District Court of the United States for the District of Columbia, and was reargued by counsel.

Upon consideration whereof, it is ordered and adjudged by this Court that the judgment of the said District Court on appeal in this case be, and it is hereby, affirmed by an equally divided Court. Each Judge of this Court reserves the right to file a statement of his vote and his reasons.

Statement of Circuit Judge BAZELON'S reasons for voting in favor of reversal of the judgment of the District Court on appeal in the above-entitled case.

BAZELON, Circuit Judge.

I was a member of the division of this court which originally heard this appeal from a conviction on two counts of filing a false non-Communist affidavit. Thereafter a rehearing in banc was ordered by the court, sua sponte. The rehearing culminated in an order, on March 9, 1956, affirming the conviction by an equally divided vote and reserving for each judge the right to file a "statement of his vote and his reasons." I choose to state my views because important issues vitally affecting the administration of justice are involved.

As a condition for making the processes of the National Labor Relations Board available to a labor organization, § 9(h) of the Taft-Hartley Act requires that each officer of the labor organization file annually with the Board a non-Communist affidavit stating that

"he is not a *member* of the Communist Party or *affiliated* with such

party, and that he does not believe in, and is not a member of or *supports* any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods." [1]

A specific provision of § 9(h) makes false affidavits punishable under 18 U.S.C. § 1001 (commonly known as the false statements statute), which declares it unlawful "in any matter within the jurisdiction of any department or agency of the United States" to "knowingly and willfully" make or use "any false writing * * * knowing the same to contain any false * * * statement * * ." [2]

While serving as president of the International Fur and Leather Workers Union, on August 30, 1950, appellant Gold filed the required affidavit. A prosecution under § 1001 followed, charging in three separate counts that Gold lied when he swore that he was not a member of the Communist Party, or affiliated with it, or a supporter of "any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods." After a trial by jury, he was acquitted on the "affiliation" count and convicted on the "membership" and "support" counts.

## I.

One of the grounds for reversal urged by Gold relates to the trial court's refusal to apply the rule of evidence in perjury cases,[3] which bars a conviction on the uncorroborated testimony of one witness.[4] The refusal was based on the premise that only "perjury," brought under 18 U.S.C. § 1621 (1952),[5] and not

---

1. 61 Stat. 146 (1947), 29 U.S.C.A. § 159(h), emphasis supplied.

2. 62 Stat. 749 (1948), 18 U.S.C. § 1001 (1952). That part of § 1001 dealing with false statements was added by the Act of June 18, 1934, 48 Stat. 996. In the general revision of the Criminal Code in 1948, § 1001 emerged from § 35 of the Criminal Code, 18 U.S.C. § 80, as amended by the Act of 1934. In that revision, 18 U.S.C. § 80 was split up. The portion relating to false claims against the Government now appears in 18 U.S.C. § 287, the so-called false statements part in § 1001. 62 Stat. 698, 749. The legislative history of § 1001 is traced in United States v. Gilliland, 1941, 312 U.S. 86, 93–95, 61 S.Ct. 518, 85 L.Ed. 598. See also United States v. Bramblett, 1955, 348 U.S. 503, 507, 75 S.Ct. 504, 99 L.Ed. 594.

  By the passage of § 1001, Congress intended to reach statements which, because they were not under oath required by an act of Congress, were not subject to prosecution under the existing perjury statute, now 18 U.S.C. § 1621. S. Rep. No. 288, 73d Cong., 2d Sess. (1934); H.R.Rep. No. 829, 73d Cong., 2d Sess. 1–2 (1934); see also 78 Cong.Rec. 2858, 2859, 3724 (1934).

3. Fisher v. United States, 9 Cir., 229 F. 2d 860, the only case directly in point, held the rule inapplicable. The issue arose, but was not decided, in Todorow v. United States, 9 Cir., 1949, 173 F.2d 439, 443. Cf. Bridges v. United States, 9 Cir., 1952, 199 F.2d 811; Miranda v. United States, 9 Cir., 1952, 196 F.2d 408, 410.

4. Weiler v. United States, 1945, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495; Hammer v. United States, 1926, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118; Young v. United States, 94 U.S.App.D.C. 54, 59, 212 F.2d 236, 241, certiorari denied, 1954, 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137.

5. That section provides: "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury * * *." 62 Stat. 773, (1948).

  The perjury statute, now § 1621, first appeared in § 5392 of the Revised Statutes, which "was a substitute for a number of statutes in regard to perjury, and was phrased so as to embrace all cases of false swearing, whether in a court of justice or before administrative officers acting within their powers * * *." United States v. Smull, 1915, 236 U.S. 405, 408, 35 S.Ct. 349, 59 L.Ed. 641.

charges of false statements otherwise proscribed by law, are within the centuries old rule.

The "continued vitality" of the perjury rule has been recognized by the Supreme Court in the last decade,[6] despite criticism that the rule has outlived its usefulness.[7] "An oath against an oath" will not support a conviction. The Government must "establish the falsity of the statement alleged to have been made by the defendant under oath, by the testimony of two independent witnesses or one witness and corroborating circumstances."[8] The evidence must be "strong, clear, convincing and direct."[9] It must establish "the fact to be proved without the necessity for * * * inference."[10] This is in contrast with circumstantial evidence "which establishes the fact to be proved only through inference based on human experience that a certain circumstance is usually present when another certain circumstance or set of circumstances is present."[11]

I think appellant was entitled to the protection of the perjury rule.[12] A prosecution for "false statement" under § 1001 is virtually identical with one for "perjury" under § 1621. Falsity is the essential element in each.[13] Cf. Hammer v. United States, 1925, 271 U.S. 620, 629, 46 S.Ct. 603, 70 L.Ed. 1118. Ordinarily there is one significant difference between the two in that the "false statement" to be prosecuted under § 1001 need not be made under oath. But this difference is absent in the present case. The defendant's non-Communist affidavit was made, and had to be made, under oath. That is the nature of an affidavit. The Government must prove the oath as an element of the offense. But that Congress specifically required false 9(h) affidavits to be prosecuted under § 1001, this case could as easily have been prosecuted under the perjury statute as under the false statement statute.[14] There have been many prosecutions and convictions under the perjury statute for false writings required by law to be under oath and voluntarily submitted to Government departments and agencies.[15] Some of these false writings have been

6. Weiler v. United States, 323 U.S. at page 609, 65 S.Ct. at page 550.

7. 7 Wigmore, Evidence §§ 2040, 2041 (3d ed. 1940).

8. Weiler v. United States, 323 U.S. at page 607, 65 S.Ct. at page 549.

9. United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 307.

10. Radomsky v. United States, 9 Cir., 1950, 180 F.2d 781, 783; See also United States v. Nessanbaum, 3 Cir., 1953, 205 F.2d 93, 97; State v. Riggs, 1921, 61 Mont. 25, 53–55, 201 P. 272, 281. There must be evidence of a direct nature presented by one witness before circumstantial evidence may serve as corroboration. See United States v. Hiss, 2 Cir., 1950, 185 F.2d 822, certiorari denied, 1951, 340 U.S. 948, 71 S.Ct. 532, 95 L. Ed. 683.

11. Radomsky v. United States, supra note 10.

12. Weiler v. United States, 323 U.S. at page 611, 65 S.Ct. at page 551.

13. That the offense of swearing falsely in an affidavit is basically the same as swearing falsely before a judicial tribunal is recognized by courts-martial procedure. The Manual for Courts-Martial, 1951, by its terms "assimilates the requirements of proof of perjury to the offense of false swearing." United States v. Gomes, 3 U.S.C.M.A. 232, 239 (1953). *False swearing*, according to the Manual, embraces "giving false testimony in a judicial proceeding * * * or in making a false oath to an affidavit." Par. 213d(4). *Perjury* consists of "giving in a judicial proceeding * * * any false testimony * * *." Par. 210.

14. Indeed, false swearing in a 9(h) affidavit has been referred to as "perjury" by Justices Frankfurter and Jackson. American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 420, 436, 70 S.Ct. 674, 94 L.Ed. 925. Justice Jackson said: "The only sanction prescribed, and probably the only one possible in dealing with a false affidavit, is punishment for perjury." Id., 339 U.S. at 436, 70 S.Ct. at page 703.

15. These cases antedate § 1001, the false statement statute. E. g., United States v. Smull, 1915, 236 U.S. 405, 408, 35 S. Ct. 349, 59 L.Ed. 641; Johnson v. United States, 1905, 26 App.D.C. 128; United States v. Abelow, D.C.S.D.N.Y.1936, 14

affidavits.[16] There is no reason why a person charged with perjury under the name of false statement should be entitled to fewer safeguards than a person charged with perjury under the name of perjury.[17]

I turn first to describe the evidence and then to discuss whether it is sufficient, under the perjury rule, to sustain the verdict on either the "membership" or "support" count of the indictment.

## II.

Appellant was an open and avowed member of the Communist Party for thirty years prior to August 24, 1950. He had attended a revolutionary training school, the Lenin Institute of Moscow, in 1930–31, and was a member of the governing body of the Communist Party from 1936 to 1948. But on August 24, 1950, he submitted the following written resignation:

"Gus Hall, National Secretary
Communist Party, U. S. A.
35 East 12th Street
New York, N. Y.
Dear Gus:

I am herewith submitting my resignation from, and severing my affiliation with, the Communist Party.

Please acknowledge by return mail.
Fraternally yours,
Ben Gold"

Five days later, on August 29, 1950, appellant executed the non-Communist affidavit in issue here. He filed it on August 30, 1950. At the same time he issued a lengthy public statement explaining his resignation, which he afterwards published in the September 1950 issue of his union magazine, "Fur and Leather Worker." The statement included the following:

"I have resigned from the Communist Party. I was a member of the Communist Party for almost 30 years.

"The Congress of the United States denies me my constitutional right to belong to the Communist Party and at the same time to hold office in a trade union.

" * * * Although the Communist Party is a legal party, the Taft-Hartley slave labor act states that a union officer cannot be a member of that Party.

*     *     *     *     *

"Our union is now compelled to comply with this law in order to defend our organization and the conditions of our members against the raiding, wrecking and strike breaking activities of the treacherous top officials of CIO and AFL.

*     *     *     *     *

F.Supp. 304; United States v. Crandol, D.C.E.D.Va.1916, 233 F. 331; Ralph v. United States, C.C.N.D.Ill.1881, 9 F. 693; United States v. Hampton, 4 Cir., 1900, 101 F. 714; See also United States v. Morehead, 1917, 243 U.S. 607, 609–610, 37 S.Ct. 458, 61 L.Ed. 926; Boehm v. United States, 8 Cir., 1941, 123 F.2d 791.

16. E. g., United States v. Smull, 1915, 236 U.S. 405, 35 S.Ct. 349, 59 L.Ed. 641. When, as here, the affidavit is sworn to before a notary, a state officer, 1621's requirement that the oath be taken before a "competent tribunal, officer or person" is satisfied. United States v. Morehead, 1917, 243 U.S. 607, 617, 37 S.Ct. 458, 61 L.Ed. 926.

17. Legislative history of § 9(h) does not show why Congress specified prosecution under § 1001 rather than § 1621. The bills as introduced in the House and Senate did not include a penalty provision. E. g., H.R. 3020, 80th Cong., 1st Sess. § 9(f) (6) (1947) (as passed by the House); § 9(h) (as passed by the Senate). It was not until the Conference Committee reported out the bill that any mention was made of § 35A of the Criminal Code, the precursor of § 1001. H.R.Rep. No. 510, 80th Cong., 1st Sess. 12 (1947). But there was no discussion of this point in either the Conference Committee Report, id. at 49, or in congressional debate on the bill, 93 Cong.Rec. 6447 (1947).

When § 9(h) was enacted in 1947, heavier penalties could be imposed under § 1001 than under § 1621. At that time the maximum penalties for conviction under § 1001 were imprisonment for ten years and a fine of $10,000. 48 Stat. 996 (1934). In 1948 the term of imprisonment was reduced to five years, the $10,000 fine being retained. 62 Stat.

"As a member of the Communist Party for 30 years, I found the thinking of the members of the Communist Party, its program and activities determined by one, and only one, burning desire—to serve the best interests of labor and the people to end the cruel exploitation of the working people, racial hatred and bigotry, and to build up an economically secure, politically free, united, democratic and peaceful America.

"Neither I nor the Communist Party ever believed in or advocated the overthrow of any democratically-elected government by force and violence.

"Workers, trade union members, progressives, liberals and Communists have a true appreciation and love for democracy. They believe in the Four Freedoms: Freedom from Want, Freedom from Fear, Freedom of Speech and Freedom of Worship. These freedoms can exist only in democratic countries. In police states under ruthless dictatorships, trade unions are outlawed, true liberals, progressives and Communists are jailed and their parties banned. Therefore, honest and true labor leaders, liberals and progressives and Communists are the staunchest fighters for democracy and democratic liberties.

\* \* \* \* \*

"I have resigned from the Communist Party, but I do not give up my belief in true democracy.

"I have complied with the Taft-Hartley Law as directed by my union, but I shall continue to fight for repeal of this slave labor law and for the reenactment of the Wagner Act."

Appellant served as a member of the United May Day Committee from 1935 to 1940, and in May 1951 and 1952 he marched with his union and spoke at May Day parades.[19]

The rest of the Government's case consisted of opinion testimony by seven ex-members of the Communist Party who were presented as expert witnesses on Party teachings.[20] Five had separated from the Party at various times from 1929 through 1948. Only two. Harper and Lautner, were members as late as 1950. None of the seven had seen or talked to appellant after 1949; two, Harper and Budenz, had never seen him, and two others, not later than 1929 and 1931. The testimony of all may be summarized as follows:

*Public Announcement.* Three of the ex-Party members [21] testified that Gold's public announcement of his resignation, particularly the statement

"Neither I nor the Communist Party ever believed in or advocated the overthrow of any democratically-elected government by force and violence"

and

"I have resigned from the Communist Party, but I do not give up my belief in true democracy"

was couched in "Aesopian language," which the Party used to convey to its

749. See Reviser's Note, 18 U.S.C. § 287 (1952). Both before and after 9(h) became law, the maximum penalties for conviction under § 1621 have been imprisonment for five years and a fine of $2,000.

19. The Government does not contend that the content of the speeches has any relevance to either count.
The Government also presented evidence that Gold and his union were active in the defense of Irving Potash, one of the eleven Communist leaders convicted of violating the Smith Act, 18

U.S.C. § 2385, see Dennis v. United States, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, but does not rely upon it in this appeal.

20. Three were paid employees of the Department of Justice, compensated on a per diem basis. Another had "joined" the Communist Party at the behest of the F.B.I.

21. These were Gitlow, Johnson and Lautner who had left the Party in 1929, 1940, and January 1950, respectively.

members a hidden meaning that would not be apparent to the uninitiated. They stated that, in the lexicon of Communism, the phrases "true democracy" and "democratically-elected government" refer to the dictatorship of the proletariat or the Soviet Union. Not only did these witnesses express their opinions on the Party meaning of these and other terms, but they were permitted to testify, in addition, that Gold's use of these terms in the announcement of his resignation was a reaffirmation of his membership in the Party.[22] On the other hand, the defense showed that Gold had many times used these terms in their ordinary sense and had often referred to the United States as a democracy.

*The "Can't Resign" Theory.* All seven of the prosecution's witnesses testified that it was the uniform policy of the Party not to permit members, particularly "effective" members or leaders, voluntarily to leave the Party. Termination of membership, they said, could be accomplished only through expulsion. Two of these witnesses, however, stated that they themselves had quit. If, despite the general policy, a member attempted to resign, the witnesses testified that he would be denounced and abused by the Party press, notably the Daily Worker. It was their opinion that failure of the Worker to "abuse" appellant in reporting his resignation proved that appellant had not terminated his membership.[23]

*Appellant's participation in May Day Activities.* Three Government witnesses who had left the Party in 1929 (Gitlow), 1940 (Johnson), and 1950 (Lautner), testified that, in their opinion, the annual May Day activities were organized by and were under the "domination and control" of the Communist Party. It was the Party, they said, which determined who the Speakers should be. In the opinion of one witness, the Party would not allow a person who had "broken" with the Party to speak at a May Day Parade. The witnesses admitted on cross-examination, however, that non-Communists and non-Communist organizations were encouraged to participate.[24]

### III.

Here, as in every perjury case, the gist of the offense is the alleged "contradiction between the accused's oath

---

22. On this point, witness Gitlow's testimony is typical:

"Q. Mr. Gitlow, calling your attention again to the paragraph that reads 'I have resigned from the Communist Party, but I do not give up my belief in true democracy,' do you have an opinion as to whether or not that paragraph contains the use of language which you described to the jury yesterday as having double meaning? A. It does.

"Q. And can you tell these ladies and gentlemen what the double meaning is and what in the language therein contained constitutes the double meaning? A. Yes; the words 'true democracy'.

"Q. Go ahead, sir. A. 'True democracy', in the Communists' lexicon, exists only under the dictatorship of the proletariat.

"Q. Does that paragraph contain any language with respect to membership in the party, in the double meaning that you described? A. It does.

"Q. What is that A. It is a reaffirmation of membership in the Communist Party."

23. Lautner, for example, testified: "An entirely different type of article would have appeared in the Daily Worker, in which Ben Gold would have been exposed as an enemy of the Communist Party, and the party membership as a whole would have been warned that 'From now on, keep away from Ben Gold, increase your vigilance, and close ranks in the Party and carry out the party policies towards this person.'"

Appellant's continued membership was also proved, the Government says, by the appearance, subsequent to the resignation, of articles in the Daily Worker which referred to appellant in "favorable" rather than unfavorable terms. The testimony was that the Worker would not have carried favorable references if appellant had resigned.

24. Gitlow, for example, said: " * * * the Communist Party did permit sympathizers of the Communist Party * * to speak at Mayday affairs of the Communist Party." Lautner stated that the Party tried to get all kinds of mass organizations to march.

and his belief * * * ." [25] To establish this contradiction requires proof of (1) the "falsity of the testimony and [2] the lack of a belief in its truth. Generally, a belief as to the falsity of testimony may be inferred by the jury from proof of the falsity itself."[26] As I have pointed out, circumstantial evidence is not enough; there must be direct evidence [27] which, if believed, conclusively establishes falsity.

## A. The Membership Count

The statute appears to contemplate three different degrees of relationship with the Communist Party, or an organization advocating overthrow of the Government by force and violence—membership, affiliation, and "support." Membership is more than affiliation, which is a "working alliance to bring the program [of the organization] to fruition." [28] Membership connotes a formal tie with or status in the Party, proof of which depends on the crucial "act of joining." American Communications Ass'n v. Douds, 1950, 339 U.S. 382, 411, 70 S.Ct. 674, 690, 94 L.Ed. 925.

Illustrative of the nature of the direct evidence required to establish this crucial act is the showing the Government made in Bridges v. United States, 9 Cir., 1952, 199 F.2d 811, 834, reversed on other grounds, 1953, 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557. There a conviction for falsely denying, in a naturalization proceeding, membership in the Communist Party was sustained on proof that the accused filled out an application for membership which was turned in to Party headquarters, agreed to assume a new name, paid dues to a unit secretary, had a Communist Party book, admitted membership in the Party at a public meeting, attended a national convention of the Party, and was elected to the national committee. The Court rejected the notion that membership could be proved by "mere association" with the Party, approval of some or all of its aims or activities, sympathy with its programs, contributions of money, or active cooperation with its activities.[29] Though such conduct may reflect "affiliation" or "support," it is not sufficient to show membership. See Bridges v. Wixon, 1945, 326 U.S. 135, 143, 65 S.Ct. 1443, 89 L.Ed. 2103.

The issue here is not whether appellant ever joined the Party, but whether he retained an actual, perhaps secret, membership after he resigned. The evidence required to establish continued membership after resignation should be comparable in quality to that required for "an act of joining." [30] Section 9(h) appears to recognize that a man may sever his membership without giving up his belief in some or all of the objectives of the Party; he may be an adherent by conviction without being one by membership. This appears from the statute's reference to affiliation and support as grounds for denying Board facilities.

When a man has been an avowed member of the Communist Party as long as Ben Gold, a purported resignation for the express purpose of enabling his union to avail itself of N.L.R.B. facilites is bound to be viewed with suspicion.

25. United States v. Remington, 2 Cir., 1951, 191 F.2d 246, 249.

26. Young v. United States, 94 U.S.App. D.C. 54, 59, 212 F.2d 236, 241, certiorari denied, 1954, 347 U.S. 1015, 74 S.Ct. 870, 98 L.Ed. 1137.

27. United States v. Remington, 191 F.2d at page 249.

28. Bridges v. Wixon, 1945, 326 U.S. 135, 144, 65 S.Ct. 1443, 1448, 89 L.Ed. 2103.

29. See also United States ex rel. Kettunen v. Reimer, 2 Cir., 1935, 79 F.2d 315, where attendance at a meeting, signing and turning in an application form, and payment of an initiation fee, inter alia, were held to establish at most "sympathy" for the Party, and to fall short of proving "affiliation" and, a fortiori, membership.

30. E. g., that one continued to pay dues to the Party, or permitted the Party to retain his name on its current books; or took an active part in formulating the Party's programs and directing its activities; or admitted a secret membership; or was told by the Party leaders to engage in Party activities secretly.

But we must recognize the possibility of a genuine choice to leave the Party in order to stay with the union. The very object of § 9(h) is to stimulate such a choice.[31] As the Supreme Court said in American Communications Ass'n v. Douds, members of the groups described in § 9(h) "are free to serve as union officers if at any time they renounce the allegiances which constituted a bar to signing the affidavit in the past." [32]

There is danger that long-continued past membership in the Communist Party, plus an asserted presumption of continuity, may obliterate the presumption of innocence that should prevail in a criminal case and place the burden of proof on the defendant. Great care must be taken to assure that present membership is proved by evidence of the required amount and quality. Such evidence is lacking in this case. There is no direct proof that appellant was a member on August 30, 1950, when he filed his affidavit, or at any later time. His public announcement of his resignation, and his participation in the May Day parades of 1951 and 1952, are at most only circumstantial evidence that he was still a member.

Read as ordinary English, the public announcement of the resignation does not contradict the fact of resignation but confirms it. If the form of the announcement can be regarded as indirect evidence of continuing membership, this is only because of the opinion testimony of ex-Communists who translated so-called Aesopian language, particularly appellant's affirmation of continued belief in "true democracy," and said that words like "democracy," "true democracy," and "democratically-elected government," as used in the announcement, referred to the Soviet Union.

The admissibility of this testimony is challenged on the ground that the opin-ion rule bars the use of expert testimony to define ordinary terminology.[33] Appellant says that rule has particular force here because (1) appellant was not shown to have used the terms in their special sense, and (2) the translation was not based on a written lexicon. But I think the court rightly admitted this evidence. The witnesses had qualified as experts on Party teachings. They said the terms used had a special meaning for Communists. In view of appellant's admitted thirty-year membership in the Party, it was not unreasonable to permit the jury to infer that he was using these terms in their special sense. In United States v. Dennis, 2 Cir., 1950, 183 F.2d 201, affirmed, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, the Court held that opinion evidence was competent to translate terms such as "Marxism-Leninism," "revisionism," "opportunistic error" and "exceptionalism," because they had "an accepted conventional meaning among members of the Party." [34]

But the opinion testimony of the experts does not provide the required direct proof of concealed membership. Assuming the accuracy of the experts' translation, appellant's statement "I have not given up my *belief* in *true democracy*" might mean no more than that he had not given up his belief in the Soviet Union or the dictatorship of the proletariat. This belief, if proved, is not direct proof of Party membership.

Nor was direct proof supplied by the further testimony of some of the experts that, in their opinion, appellant meant he was still a member. This testimony was inadmissible. The witnesses could testify that his words were capable of this sense, but not that he used them in this sense. That testimony, which touched the ultimate issue in the

---

31. In addition, of course, the penalty attached to 9(h) is designed to compel those who could not or would not resign their Communist allegiance to resign or be forced from their union positions.

32. 339 U.S. at page 414, 70 S.Ct. at page 692.

33. 7 Wigmore, Evidence § 1955 (3d ed. 1940).

34. 183 F.2d at page 229.

# 772

case, was outside the scope of their expertise.[35]

Gold's appearance as a speaker at the 1951 and 1952 May Day parades is only indirect evidence, if any, of Party membership on August 30, 1950.[36] Lautner, who left the Party in January 1950, testified that in his opinion the key speeches in 1951 and 1952 would have been made by Party members, and that no one who had broken with the Party would have been allowed on the platform. As evidence that appellant was a member when he swore he was not, this involves the following inferences: (1) a man who left the Party in 1950 knew what qualifications were required of speakers at the 1951 and 1952 May Day parades; (2) since this man said the speakers were required to be Communists, and since Gold was a speaker, Gold was a Communist on those dates; (3) therefore Gold was a Communist on August 30, 1950.[37]

Aside from these "overt acts" of appellant, as interpreted by the "expert witnesses," the Government's case consisted of conclusory opinion testimony as to the general rules, teachings and tactics of the Communist Party, chiefly to the effect that the Party did not accept resignations and abused members who tendered them. Such general testimony is not direct evidence of what appellant did or did not do. If no one can effectively resign from the Party, no union officer with appellant's history can ever comply with § 9(h), and the statutory phrase "is not a member" is precisely equivalent to "has never been a member." This possibility Douds specifically rejects.

It follows that appellant is entitled to acquittal on the membership count.

## B. *The Support Count*

The other count on which the appellant was convicted charged him with "support" of an "organization, namely, the Communist Party, which said Party taught the overthrow of the United States Government by force." He contends, and I agree, that the "support" clause of the affidavit required by § 9(h) means "support" of the "organization" in its objective of forcible overthrow. American Communications Ass'n v. Douds makes clear that § 9(h) was aimed at barring from union leadership adherents of the doctrine of forcible overthrow [38] because they "represent a continuing danger" of translating that belief into action by fomenting "disruptive political strikes." [39] The statute reaches these persons in two ways.

35. See Simmons v. United States, 1953, 92 U.S.App.D.C. 122, 124, 206 F.2d 427, 430; Cf. Riley v. United States, 1955, 96 U.S.App.D.C. 258, 259, 225 F.2d 558, 559.

36. Appellant's union had participated in the May Day parades since 1907, and the occasion was a traditional holiday for union members. Union members, both Communist and non-Communist, have always marched in the parades, and did so in 1951 and 1952. The evidence tended to show; on the other hand, that the Party controlled and dominated the organization of the celebration.

37. The court's holding in United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 308, with respect to the character of the corroborative evidence required is a fortiori applicable here: "Evidence tending to establish the probability of conduct is not enough; more than that is required; the path from the corroborating evidence must lead directly to the inevitable—not merely probable—conclusion of falsity. The corroborative evidence * * * must be equally strong and convincing as the direct testimony which would be regarded as sufficient proof."

38. "In enacting 9(h), Congress had as its objective the protection of interstate commerce from direct interference, not any intent to disturb or proscribe beliefs as such. Its manifest purpose was to bring within the terms of the statute only those persons whose beliefs strongly indicate a will to engage in political strikes and other forms of direct action when, as officers, they direct union activities." 339 U.S. at page 407, 70 S.Ct. at page 688.

39. 339 U.S. at page 393, 70 S.Ct. at page 681.

First, it specifically refers to members and affiliates of the Communist Party. Though the Party purports to be a political organization, the Supreme Court found no infringement of First Amendment rights because the Communist Party differs from other political parties in the nature of its program—chiefly its dedication to the principal of violent overthrow—and in the nature of its membership. Membership is akin to a conspiracy wherein "individuals who assume such obligations are chargeable, on ordinary conspiracy principles, with responsibility for and participation in *all* that makes up the Party's program",[40] including the principle of violent overthrow.

Second, the statute aims at those whose adherence to the doctrine of forcible overthrow is shown not by an "act of joining" but from the inference that they "believe" in it or from evidence that they support an organization that "believes in or teaches" it. Here Congress moved closer to the realm of First Amendment rights, since questions of "belief" and "support" turn so largely upon proof of an individual's opinions and views.

The Court's opinion in Douds resolved the conflict between the national interest, as embodied in the statute, and the individual interest by narrowly reading the portion of the oath dealing with belief.[41] The opinion makes clear that the terms of the oath cannot be construed so

as to force, contrary to our basic traditions, " 'disclosure of attitudes on all manner of social, economic, moral and political issues.' "[42] The only belief whose disclosure the Court held could be forced, as a condition of union leadership, was a belief in violent overthrow. And the Court recognized that a serious constitutional question would be posed if the statute were read to "include all persons who might, under any conceivable circumstances," subscribe even to this belief.[43] Accordingly the Court construed the entire clause, in consonance with the dominant purpose of 9(h), to apply to persons and organizations believing in violent overthrow of the Government "as it presently exists under the Constitution as an objective, not merely a prophecy."[44]

The Court in Douds did not construe the word "support," except to hold that the word itself, in the context of 9(h), was not too vague for criminal purposes. I cannot, consistently with the First Amendment, read "support" more broadly than the Court said "belief" might be read. To "support" an organization ordinarily may have two meanings: (1) to aid or participate in its activities, as by contributing money; (2) to express belief in its objectives.[45] The words "support of an organization," in this case the Communist Party, broadly interpreted, apply to an expression of belief in any of the objectives of the Party, no matter how lawful.

---

40. 339 U.S. at page 432, 70 S.Ct. at page 701, emphasis supplied. And see Dennis v. United States, 1951, 341 U.S. 494, 498, 71 S.Ct. 857, 861, 95 L.Ed. 1137, where the Court cites with approval a Court of Appeals finding that the Party is rigidly controlled and that "Communists, unlike other political parties, tolerate no dissension from the policy laid down by the guiding forces, but that the approved program is slavishly followed by the members of the Party * * *."

41. Only three members of the Supreme Court joined in this opinion. Since the Court was equally divided as a result of the non-participation of three members, this opinion sustained the validity of the belief portion of the oath by affirming

the Court of Appeals. Justices Jackson and Black dissented, primarily on First Amendment grounds. 339 U.S. at pages 442–445, 445–453, 70 S.Ct. at pages 705–707, 707–711. Justice Frankfurter dissented on the ground that, in certain respects, the second part of the oath, including the term "supports," was void for vagueness. Id., 339 U.S. at page 415, 70 S.Ct. at page 692.

42. 339 U.S. at page 410, 70 S.Ct. at page 689.

43. Id. 339 U.S. at page 407, 70 S.Ct. at page 688.

44. Ibid.

45. Usually "support" in the first sense is a form of "support" in the second sense.

This was the thrust of the court's instruction. The court gave the jury the following dictionary definition of "support":

"To uphold by aid or countenance; to take the side or promote the cause of; to back up, as, for example, to support the administration; also, to uphold or defend as valid, right, just, etcetera; as, for example, to support a policy, even at the risk of life or fortune, or as another example, to support the claim of." [Webster's New International Dictionary.]

Under that guide "support" might be found if, for example, a person upheld or defended as "valid * * * a policy," such as repeal of the Taft-Hartley or Smith Act, which policy merely happened to coincide with the policy of the Communist Party on those issues. Support might also be found on the basis of evidence that appellant "regarded May Day as an international labor holiday, opposed the McCarran, Velde and McCarthy committees, had favored a second front during World War II, had denounced the 80th Congress, and had made a public appeal for funds for the legal defense of Smith Act defendants." [46]

The vice, for criminal purposes, of the broad dictionary definition was compounded by a second portion of the instruction, which followed the literal wording of the statute. The jury was told a conviction depended on the finding that appellant's

"actions constituted support, as the word support had just been defined, of an organization which taught the overthrow of the United States Government by force, and that said support was being given by defendant on August 30, 1950."

If this interpretation of the statute prevails, once it is found that a "coincidental parallelism" [47] exists between some of an individual's views and some of the objectives of the Communist Party, the jury may convict him of false swearing if it thinks the Party advocates forcible overthrow of our Government, even though the individual does not "support" that advocacy. We should decline to read the statute in a manner which would make its constitutionality doubtful. We should hold that the "support of an organization" which the statute contemplates is support of "violent overthrow of the Government as it presently exists under the Constitution as an objective" of the organization, not support of other and entirely lawful objectives of the same organization. [48] It is this reading which must prevail in a prosecution for false swearing based on the statutory oath. This is no more than the traditional requirement of proof of aiding and abetting, a concept closely akin to support, that the aider and abettor must not only know of but share in the unlawful purpose of his principal, [49] or of conspiracy, where all who conspire must share the unlawful purpose of the joint action. [50]

I find no direct evidence which would justify an inference that, on August 30, 1950, appellant supported the Party in the objective of violent overthrow of our Government as it presently exists. At most a legitimate inference can be drawn from appellant's participation in Party

---

46. Brief for appellant, p. 47.

47. Justice Frankfurter, concurring in part and dissenting in part in American Communications Ass'n v. Douds, 339 U.S. at page 422, 70 S.Ct. at page 696.

48. 339 U.S. at page 407, 70 S.Ct. at page 688.

49. Pereira v. United States, 1954, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435; Nye &

Nissen v. United States, 1949, 336 U.S. 613, 619, 620, 69 S.Ct. 766, 93 L.Ed. 919; Johnson v. United States, 8 Cir., 1952, 195 F.2d 673, 675; United States v. Peoni, 2 Cir., 1938, 100 F.2d 401, 402.

50. United States v. Falcone, 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128; United States v. Peoni, 2 Cir., 1938, 100 F.2d 401, 403.

activities during the 1920's and 1930's [51] that he gave such "support" long before he signed the affidavit. There is no evidence, of the quality required to sustain a perjury conviction, to show that appellant adhered to that view when, or after, he resigned from the Party on August 24, 1950. His appearance as a speaker at May Day parades in 1951 and 1952 is not direct proof of adherence to that view. The Government concedes that the contents of his speeches are irrelevant.

His public announcement is capable of the construction that he was in accord with the lawful objectives of the Party.[52] It cannot be taken as direct evidence of a belief in or support of the objectives the statute proscribes.

I would, therefore, reverse the conviction on both the support and membership counts, and remand the case with directions to enter a judgment of acquittal.

### IV.

Even if appellant were not entitled to a judgment of acquittal, there are at least two errors which would require reversal for a new trial.

A. An F.B.I. agent, investigating another case in which falsity of a non-Communist affidavit was also charged, telephoned or visited three members of the petit jury or their families during the trial and inquired whether they had received any "propaganda" literature. The impact of these contacts on the jurors involved, and those who heard about them was so prejudicial that its effect could not be erased, and was perhaps even enhanced by the hearing the court held to determine if any should be disqualified. Remmer v. United States, 1956, 350 U.S. 377, 76 S.Ct. 425, makes plain that the court's refusal to declare a mistrial here is prejudicial error.

B. As I pointed out, supra, the opinion testimony that appellant's resignation statement was in fact his reaffirmation of party membership, was inadmissible to support the conviction. Even if there was other evidence upon which the conviction could be sustained, this opinion testimony was so highly prejudicial that its erroneous admission requires a new trial. The question whether or not appellant was still a member, or had resigned, was for the jury, not for the opinion of the witnesses. To permit witnesses to testify, as Budenz did, for example, that a certain sentence in appellant's resignation statement "is an assertion of continued membership in the Communist Party"[53] is in substance to transform the trial by jury into a trial by experts.

### V.

Finally the case should also be remanded for a hearing on appellant's offer, which the trial court rejected, to prove that Government employees on the grand and petit juries were biased as a class.[54] My views on the grand jury issue are expressed in Quinn v. United States.[55] They are applicable with even greater force to the petit jury. A de-

51. It was shown, for example, that, in 1930–31, appellant, at the Lenin School in Moscow, took courses in insurrection, sabotage, overthrow of capitalist governments, use of poison gas, and studied maps of New York, Pittsburgh, Detroit and Gary to determine how to cripple a city.

52. E. g., "As a member of the Communist Party for 30 years, I found the thinking of the members of the Communist Party, its program and activities determined by one, and only one, burning desire—to serve the best interests of labor and the people to end the cruel exploitation of the working people, racial hatred and bigotry, and to build up an economically secure, politically free, united, democratic and peaceful America."

53. See also note 22, supra.

54. Thirteen members on the indicting grand jury were Government employees. Five Government employees and the wife of a Government employee were on the petit jury.

59. 1952, 91 U.S.App.D.C. 344, 350, 203 F. 2d 20, 26 (dissenting opinion).

termination that Government employees are disqualified as grand jurors in this case would require dismissal of the indictment; disqualification as petit jurors would require a new trial.