**Gomer A. EVANS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 5443.**

United States Court of Appeals
Tenth Circuit.

Jan. 2, 1957.

Frank Hickman, Tulsa, Okl. (Frank Robert Hickman, Tulsa, Okl., was with him on the brief), for appellant.

Charles H. Freob, First Asst. U. S. Atty., Tulsa, Okl. (B. Hayden Crawford, U. S. Atty., Tulsa, Okl., was with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Appellant, hereinafter referred to as "defendant", was tried and convicted upon an indictment charging that "on or about March 15, 1955, Gomer A. Evans transported in interstate com-

merce from Tulsa, Oklahoma, in the Northern Judicial District of Oklahoma, to Fort Worth, Texas, a stolen 1954 Oldsmobile '98' Holiday Automobile, Motor Number V 324964, he then knowing said automobile to have been stolen", in violation of Title 18 U.S.C.A. § 2312. The case was tried to a jury, and this appeal is from a judgment and sentence entered upon conviction.

■ To sustain a conviction under this section, the Government must prove that the defendant transported or caused [1] the automobile to be transported in interstate commerce, and that defendant knew the automobile to have been stolen at the time he transported or caused the transportation. The defendant contends the government failed to sustain its burden of proof as to both of these elements.

The evidence reveals numerous transactions involving several automobiles, within a relatively short period of time. The thief who stole the Oldsmobile in question was one Sam Thompson. By his own confession he stole it from a used car dealer in Kansas City on December 19, 1954. Shortly thereafter, when he had driven the stolen car from Kansas City to Tulsa, he bought a wrecked car of the same year and model from a Tulsa salvage dealer, took the engine out of the stolen car and replaced it with the motor of the salvage car, and also had the title papers of the salvage car made out to himself. On December 24, 1954, Thompson sold the stolen car, with the salvage engine in it, to Gomer Evans Motor Company. Thompson testified that Gomer Evans, the defendant herein, was on the car lot when he, Thompson, drove up with the stolen car. The defendant made an offer which Thompson accepted. Defendant left the lot, and defendant's brother, Jerome Evans, consummated the deal.

Also present on the lot was another used car dealer, Clark Spears, who bought the stolen car immediately. Spears used the car as his personal car for several months.

On March 11, 1955 a used car dealer telephoned defendant to ask him about Sam Thompson, informing him that a car Thompson had sold him was a stolen car. Thompson had just left Tulsa on his way to California, apparently to avoid prosecution. Several things happened immediately after defendant received the telephone call about Thompson. Defendant tried to reach Thompson and discovered he was in Albuquerque, New Mexico, and that his wife intended to fly to join him the next morning. Defendant's brother Jerome flew to Albuquerque on the same plane with the wife, and brought the couple back to Tulsa with him, informing Thompson that defendant knew Thompson was dealing with stolen cars. Also on the same day, Mary Frances Jackson traded her 1955 Ford to Clark Spears for the stolen Oldsmobile. The trade was even, no money being involved.

Jerome Evans and the Thompson couple arrived at a Tulsa motel about 3:30 a. m., Sunday, March 13. Thompson testified that he and his wife checked in and went to their cabin with Jerome. Jerome made a telephone call and then left. The Thompsons then went across the street to a cafe, and not more than five minutes after they entered the cafe, defendant joined them there. Then they went back across the street to the motel. Thompson testified that at this time he saw the stolen Oldsmobile and defendant's Cadillac parked together in front of a cabin of the motel, in the door of which Mary Frances Jackson was standing, dressed in a nightgown and robe. Thompson heard defendant tell Mrs.

1. Under the definition of "principal" in Title 18, U.S.C.A. § 2(b), to "cause" an act to be done suffices. Nye & Nissen v. United States, 9 Cir., 168 F.2d 846, affirmed 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Swanne Soon Young Pang v. United States, 9 Cir., 209 F.2d 245;

United States v. Lieberman, D.C.S.D. N.Y., 15 F.R.D. 278. The section reads: "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal."

Jackson that he was going out to get a lawyer and would be back later on. Defendant and Thompson then drove to a lawyer's house.[2] There the Thompsons deeded their house to the defendant to secure him against any loss which might result from the stolen cars, including the Oldsmobile.

Sometime between March 13 and 16, Mary Frances Jackson drove the stolen Oldsmobile from Tulsa to Fort Worth. Also sometime during that period, defendant flew from Tulsa to Fort Worth. On March 16 defendant appeared at a Fort Worth used car lot with Mrs. Jackson and participated with her in trading the stolen Oldsmobile for a Mercury, paying out of his own pocket a $550.00 difference. The record does not disclose how the defendant and Mrs. Jackson returned to Tulsa, but on March 22nd Mrs. Jackson sold the Mercury to another Tulsa used car dealer. Shortly after that she repurchased the 1955 Ford she had originally owned, from the defendant, who apparently had in the meantime acquired the title from Clark Spears.

It is true that the chief evidence on two crucial points, defendant's seeing Mrs. Jackson immediately prior to her driving the stolen car from Oklahoma to Texas, and defendant's knowledge that the car was stolen before this meeting with Mrs. Jackson, depends on the testimony of Thompson, a car thief and admittedly a shady character. However,

this does not justify defendant's claim that the jury's verdict must have been based on inferences drawn from inferences. The brother Jerome's action in bringing the Thompsons back to Tulsa, and defendant's taking of the deed to the house, furnished evidence in addition to Thompson's direct testimony upon which the jury could reasonably infer knowledge on the part of defendant that the Oldsmobile was stolen, such knowledge dating from before Jerome left for Albuquerque.

Although the record is not clear as to the extent of the association between the defendant and Mary Frances Jackson, the record does show that she traded her 1955 Ford for the stolen Oldsmobile on the same day that defendant was informed that Thompson had been selling stolen cars; that when Jerome brought the Thompsons to Tulsa he took them directly to the motel where she was staying; that in a matter of minutes after Jerome made a telephone call from the motel, the defendant walked into a cafe across the street to talk to Thompson; that the stolen Oldsmobile and defendant's Cadillac were parked together in front of a cabin in the door of which she was standing not long after 3:30 a. m.; that defendant informed her that he was going out to get a lawyer; that defendant told her he would be back; that defendant appeared with her three days later at a Fort Worth used car dealer's

2. The testimony reads as follows:

"Q. Did you go over to the cabin in front of which those cars were parked? A. Yes, sir.

"Q. Were you with Gomer then? A. Yes, sir.

"Q. Did you see anybody else in that cabin? A. Yes, sir.

"Q. Where those cars were? A. Yes, sir.

"Q. Who was it, do you know? A. Yes, sir, Mary Frances.

"Q. You saw her right there at the motel? A. Yes, sir.

"Q. In the cabin in front of which Gomer's Cadillac was parked, and the '54 Oldsmobile; was that right? A. Yes, sir.

"Q. Now did you know who she was then at that time? A. No, sir.

"Q. Have you subsequently found out who she was? A. Yes, sir.

"Q. I see, and you say it was Mary Frances Jackson? A. Yes, sir.

"Q. Did you actually see her; did you go in the cabin where she was? A. No, sir, she came to the door.

"Q. But you could see her in the door? A. Yes, sir.

"Q. How was she dressed? A. She had on a nightgown and one of those things that goes over it.

"Q. Did Gomer say anything to this woman? A. Yes, sir.

"Q. Do you remember what he said? A. Said he was going out and get a lawyer, and that he would be back later on."

lot, she having meanwhile driven the stolen car from Tulsa to Fort Worth, and participated with her in trading off the stolen Oldsmobile; and that a few days later both the defendant and Mrs. Jackson were back in Tulsa and she sold the car for which the stolen car had been traded and purchased the 1955 Ford she had originally owned, from defendant.

■ These facts take on an added significance when it is realized that defendant, who dealt directly with the thief, was primarily liable for any loss suffered by a subsequent purchaser of the stolen car, and that it would be to defendant's advantage to place it in an out-of-state dealer's hands so as to decrease the likelihood of a possible loss being traced back to him. The evidence is adequate to support the jury's verdict.

■ The function of the appellate court is limited to inquiring as to whether the verdict of the jury is supported by the evidence, viewed in the light most favorable to the prosecution, and it is elementary that circumstantial evidence upon which reasonable inferences can be based will suffice. Seefeldt v. United States, 10 Cir., 183 F.2d 713; Madsen v. United States, 10 Cir., 165 F.2d 507, 511; Wilder v. United States, 10 Cir., 100 F.2d 177, 182; United States v. Antrobus, 3 Cir., 191 F.2d 969, certiorari denied 343 U.S. 902, 72 S.Ct. 637, 96 L. Ed. 1321; United States v. Angel, 7 Cir., 201 F.2d 531.

Judgment affirmed.

HUXMAN, Circuit Judge (dissenting).

It is conceded that appellant Gomer A. Evans did not transport the stolen Oldsmobile from Tulsa, Oklahoma, to Fort Worth, Texas. He therefore stands charged with "causing" it to be so transported by Mrs. Jackson. To establish that offense it must be established that he induced her to transport the stolen car. In other words, the transportation by her must have been the result of an agreement or understanding between him and Mrs. Jackson that she would drive the car to Fort Worth and that he would thereafter appear there and help her dispose of it.

There is no evidence in the record, as I review it, to support the conclusion that Evans knew he was buying stolen cars when he bought these three cars from Thompson. There is nothing in the record to support a conclusion that he was other than a reputable dealer in second hand cars. It is true that when his brother Jerome Evans met Thompson in Albuquerque he told him they knew that he had sold them stolen cars, but the record clearly reveals that this information was not obtained until after Gomer Evans had purchased the three cars from Thompson.

Neither is there evidence in the record that Gomer Evans and Mrs. Jackson were at any time together alone while she was registered at the motel, either before Thompson and his wife registered there, during the time the Thompsons were registered there, or after the Thompsons had left. The fact that Mrs. Jackson and the Thompsons registered at the same motel on the night in question, so far as the record shows, was a mere coincidence. It could not have been planned. That is so because when Jerome Evans returned to Tulsa with the Thompsons in the early morning he suggested that they spend the rest of the night at his house, but they wanted to go to a motel, and Jerome then suggested the motel at which they registered. For approximately thirty hours he had been out of the city. He could not have known that Mrs. Jackson was in Tulsa staying at this motel. Neither did his brother Gomer know that he was taking the Thompsons to this motel.

After the Thompsons were in their cabin, Jerome used their telephone, called a number and carried on a conversation. Thompson did not know whom he called nor did he hear any of the conversation but obviously he called his brother Gomer, because after the conversation he took the Thompsons' car and went to his home. The Thompsons then went to a nearby restaurant for something to eat

and in about five minutes Gomer Evans appeared at the restaurant. Gomer could not have known where to find them had he not been informed by his brother Jerome.

As I read Thompson's testimony, there is nothing therein which supports an inference that he saw Gomer's Cadillac prior to the time he and Gomer left the cabin to cross the driveway and enter the car to go to the attorney's home. It was then he saw the two cars parked in front of Cabin 45 which was occupied by Mrs. Jackson. His testimony seems clear to me that when he first saw Mrs. Jackson she was in her cabin, not standing in the door. He was asked, "Q. You saw her right there at the motel? A. Yes, sir. Q. In the cabin in front of which Gomer's Cadillac was parked * * * ? A. Yes, sir." He testified that he did not go into the cabin but that "she came to the door" and that he saw her standing in the door. The exact language of Gomer in his conversation with Mrs. Jackson, testified to by Thompson was " * * * we was going out and get a lawyer, and that we would be back later on." The "we", of course, referred to Thompson and Gomer Evans. That was the sum total of the only conversation Gomer Evans ever had with Mrs. Jackson as far as the record shows. That was the only time, according to the record, that Gomer Evans and Mrs. Jackson were together prior to the time she returned to her home in Fort Worth. Certainly this conversation is wholly insufficient to sustain the conclusion that it was there arranged that she should drive her car to her home in Fort Worth and that he would then come down later and help her dispose of it. If we want to give free rein to our imagination or speculation we can surmise a number of things not supported by the record.

Neither is the remark by Gomer Evans that "we would be back later on" sufficient to sustain a conclusion that upon his return he had an opportunity to see Mrs. Jackson and arrange for her to drive the car to her home in Fort Worth. It is without dispute that when Thompson and Gomer Evans left in the Cadillac they went to the attorney's home to prepare the legal papers to transfer title to Thompson's home to Evans as security; that they prepared these papers and together with the attorney returned to Thompson's cabin, got Mrs. Thompson, and that the four then returned to the attorney's home where the papers were executed. Thompson and his wife then got their own car at Jerome's home, returned to their cabin, got their things and were on their way. There is a complete dearth of any evidence that Gomer Evans and Mrs. Jackson had any further contacts or communications with each other prior to her leaving for her home in Fort Worth, Texas.

To sustain the conviction we must infer that there was another meeting between Mrs. Jackson and Gomer Evans before she returned to Fort Worth. We must infer that at such other meeting, of which there is no proof, it was agreed that she should transport her car to Fort Worth. We, thus it seems to me, pile inference upon inference in order to find evidence to sustain the jury's verdict and the judgment based thereon.

The evidence would be sufficient to sustain a finding that Gomer Evans assisted Mrs. Jackson in disposing of a stolen car in Texas, knowing it to have been stolen. But that was not the offense with which he was charged. Neither does the fact that she later sold the Mercury she acquired in Fort Worth to another Tulsa dealer and thereafter repurchased her original Ford supply the missing link necessary to establish the indispensable fact that prior to her going to Fort Worth Evans arranged with her for the transportation of the car in interstate commerce. These were subsequent events having no bearing on what occurred prior to her going to Fort Worth. Furthermore, there is not even a suspicion in the record that Evans was with her at these times, aided her in these transactions, or even knew of them. It is my conclusion that the evidence is insufficient to sustain a verdict of guilty or a judgment based thereon. I would accordingly reverse.