Maurice E. TRAVIS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 5879.

United States Court of Appeals
Tenth Circuit.

Aug. 3, 1959.

Rehearing Denied Aug. 21, 1959.

Murrah, Circuit Judge, dissented.

Nathan Witt, New York City, for appellant.

Donald E. Kelley, U. S. Atty., Denver, Colo., and Paul C. Vincent, Atty., Dept. of Justice (Philip R. Monahan and Anthony A. Ambrosio, Attys., Dept. of Justice, Washington, D. C., were with them on the brief), for appellee.

Before PHILLIPS, MURRAH and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

This action is here on appeal for the second time. On the first appeal,[1] this court set aside a conviction under the false statement statute, 18 U.S.C.A. § 1001,[2] and ordered a new trial because of prejudicial error committed when the prosecutor was allowed to improperly cross-examine appellant's character witnesses. The present appeal is from a second conviction after retrial of the case in the United States District Court for the District of Colorado. Reversal is sought upon a claim of insufficiency of the evidence to support the verdict and numerous assertions of prejudicial error committed during the trial. Appellant also challenges the constitutionality of 18 U.S.C.A. § 3500 both as to its provisions and as construed and applied by the trial court.

The appellant, Maurice E. Travis, was convicted by a jury on four counts of an indictment charging him with falsely and fraudulently attesting that he was not an affiliate or member of the Communist Party in two "Affidavits of Non-Communist Union Officers" he executed as a national officer of the International Union of Mine, Mill and Smelter Workers.[3] The first affidavit was executed on December 19, 1951, and the other on December 3, 1952, and Mine-Mill filed them with the National Labor Relations Board in compliance with the provisions of Section 9(h) of the National Labor Relations Act as amended by the Labor Management Act of 1947 (29 U.S.C.A. § 159(h).)[4]

Following conviction, appellant was fined $2,000 and sentenced to serve a four-year term of imprisonment on each of two counts of the indictment. No fine

---

1. Travis v. United States, 10 Cir., 247 F. 2d 130.

2. "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

3. Hereafter called Mine-Mill.

4. "No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, * * * and no complaint shall be issued pursuant to a charge made by a labor organization * * * unless there is on file with the Board an affidavit executed * * * by each officer of such labor organization * * * that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. * * *"

was imposed as to the remaining two counts, but he was sentenced to four-year prison terms on both to run concurrently with the terms imposed on the other counts. Thus, he was sentenced to a total of eight years in prison and fined $4,000.[5]

Since appellant challenges the sufficiency of the evidence we shall summarize that evidence urged by the government as ample basis for the jury verdict. This consists primarily of the testimony of three former Communist Party members who associated with Travis in various capacities as officers of Mine-Mill. Their testimony indicates that in 1942 Travis was employed by Mine-Mill as coordinator for the area of Northern California. He was at that time a member of the Communist Party with an assignment to carry on the Communist Party activities among the Mine-Mill workers in his area. Thereafter, he advanced to positions of prominent leadership in the Mine-Mill Union becoming Assistant to the President in 1946, Vice President in 1947 and President later that year. He has been Secretary-Treasurer of the Union from 1948 until the time of trial. There was extensive evidence of Travis' activities as a Communist Party member prior to 1949. No prolonged description of his actions will be undertaken here except to point out that as he progressed to positions of national leadership in Mine-Mill he was able to use those positions to further the interests of the Party. Illustrative of the scope of his activities is the evidence that in 1946 the Communist Party designated a group of its members who were prominent Mine-Mill leaders to coordinate the Communist activities within Mine-Mill with a view to controlling the Union proper. Although not an official organization of Mine-Mill, this group became known as the "Steering Committee." Travis was one of the initial members of the Steering Committee and its frequent meetings for planning Party strategy and organizing ac-

tivities within the Union were usually presided over by him "or some other ranking Communist official." His influence in these meetings was notable. On one occasion he stated to the other committee members that since the Party had gained a majority of votes on the Executive Board of Mine-Mill they should effect certain changes in Union staff and that previous actions taken by the anti-Communist faction of the Board should be reversed. These proposals were subsequently adopted by the Mine-Mill Executive Board. On another occasion Travis, as a member of the Steering Committee, participated with national officers of the Communist Party in planning strategy for the selection and support of Party-approved candidates for the international offices of Mine-Mill. The resultant strategy was later substantially carried out at a Mine-Mill national convention.

In 1947, Congress amended the National Labor Relations Act so as to restrict enjoyment of the collective bargaining advantages of its provisions to labor organizations whose officers had filed affidavits attesting that they were not members of or affiliated with the Communist Party. 29 U.S.C.A. § 159 (h).

The government introduced into evidence a copy of a public statement made by Travis in the Union paper by which he declared that he had resigned from the Communist Party in order to comply with the new Taft-Hartley amendment. It then undertook to show that the resignation was merely a pretense and that in fact Travis' membership in the Party continued during the period material to this conviction. The evidence in this regard delineated a Communist labor meeting in New York called to decide whether the Party would advocate that its members sign the non-Communist affidavits under the new law. It was decided that Party policy would be against signing. Appellant participated

5. The judgment giving rise to the instant appeal differed from the judgment at the first trial in that fines of $2,000 were imposed on all four counts at the former trial making a total fine of $8,000.

in that meeting. Later, when he reported the decision to Party members of his own Union he asked his fellow Communist Gil Green if the teachings of V. Lenin, to the effect that Communists working inside trade unions must remain there at all costs, including the use of artifice or device to do so, were applicable to their situation. Green replied affirmatively and pointed out that labor leaders could circumvent the law by belonging to a "Thursday afternoon social club" since the law pertained only to present membership and not past or future membership.

Following the passage of the non-Communist affidavit requirement of the Taft-Hartley law, the Mine-Mill Executive Board adopted a policy of non-compliance, thereby exercising its option as provided by the Act. Non-compliance, of course, resulted in inability of the Union to receive the advantages of utilizing N.L.R.B. facilities for filing charges of unfair labor practices and participation in Board elections. When it became apparent that loss of advantages to the Unions was causing difficulty, the Mine-Mill Executive Board by resolution reversed its previous position and adopted a policy of compliance. Travis was a member of the Executive Board when that decision was made. His statements to government witness Mason, set forth infra, at the time he wrote his "resignation statement" indicated that his action was in accordance with Communist Party policy. This resignation statement was published in the Union paper on August 15, 1949.[6]

The government evidence pertaining to appellant's continued Party membership after the resignation statement showed that in the fall of 1951 Travis used government witness Fred Gardner, who had been recently employed by Mine-Mill, to assist him in crossing the border into Canada. Travis explained to Gardner that he was having difficulty crossing the border because of his membership in the Party and the public resignation statement and that it would be easier to cross

6. Excerpts from this public resignation statement illustrate its general tenor:

"Since the interest of the International Union is uppermost in my mind, I have been confronted with the problem of resigning from the Communist Party, of which I have been a member, in order to make it possible for me to sign the Taft-Hartley affidavit. I have decided, with the utmost reluctance and with a great sense of indignation, to take such a step. My resignation has now taken place and as a result, I have signed the affidavit.

"*This has not been an easy step for me to take. Membership in the Communist Party has always meant to me, as a member and officer of the International Union, that I could be a better trade unionist: it has meant to me a call to greater effort in behalf of the union as a solemn pledge to my fellow members that I would fight for their interests above all other interests.* (Emphasis in original.)

"The very premise of the Taft-Hartley affidavits is a big lie, the same sort of lie that misled the peoples of Germany, Italy and Japan down the road to fascism. It is a big lie to say that a Communist trade unionist owes any higher loyalty than to his union. On the contrary, trade unions are an integral part of a Socialist society, the kind of society in which Communists believe. Therefore, I believe that good Communists are good trade unionists.

\* \* \* \* \*

"At the same time, I want to make it absolutely clear that my opinion continues to be that only a fundamental change in the structure of our society, along the lines implied in the very words of the charter of our International, 'Labor produces all wealth—wealth belongs to the producer thereof,' can lead to the end of insecurity, discrimination, depressions and the danger of war.

"I am convinced that capitalistic greed is responsible for war and its attendant mass destruction and horror, I am convinced it is responsible for depression, unemployment and the mass misery they generate. \* \* \*

\* \* \* \* \*

"Therefore, I want to make it crystal clear that my belief in Communism is consistent with what I believe to be the best interests of the members of this Union and the American people generally and that I am especially happy to be able constantly to remember that it is consistent with the finest traditions of the International Union."

in Gardner's car because it would not be recognized by Canadian police. He stated that Gardner had come to him well recommended by the Communist Party of Cleveland, Ohio, and that he was glad of that. Travis expressed regret that his public resignation had been necessary in order for Mine-Mill to conform to the Taft-Hartley filing requirements and in discussing this he said that he " * * * believed it was a mistake because it gave the enemies of the Party an opportunity to use that in pointing out that his wasn't a true resignation from the Party, that actually it was done merely to conform to the Taft-Hartley affidavits. * * * "

Relative to membership after execution of the first affidavit (December 19, 1951), witness Mason testified that in March of 1952 Travis stated to him that the Soviet delegation at the World Federation of Trade Unions in Paris, France, was demanding that the "American left-wing unions" who had been expelled from the Congress of Industrial Organizations form a "third federation." He said that the Communist Party had left it up to those in the Unions to make the decisions and asked Mason what his view was. Travis expressed agreement with Mason's response that he opposed such a move and said that "the boys in the other unions" concurred and had left it to him, Travis, to communicate the reply to Paris.

The evidence postdating the execution of the second affidavit indicated that in March 1953 a staff conference of Mine-Mill was held in Denver, Colorado, for the discussion of organizational and political action. At this conference Travis handed to witness Mason a copy of the proposed conference agenda. Mason examined the outline of the legislative program contained therein which listed a number of items such as "repeal of the McCarran Act" and "fight against witch-hunting" and called Travis' attention to the fact that nothing was listed pertaining to betterment of workers. Travis agreed and directed that matters suggested by Mason be included. However, later that day, Travis told Mason "these other things, too, like repeal of the McCarran Act, are important, and he said 'When they get us Communists they will be after people like you if we don't get these laws repealed.' "

In June 1953, witness Gardner was to be transferred by Mine-Mill to a new assignment in the Coeur d'Alene Mining District of Idaho. Travis instructed him to stop in Denver, Colorado, on his way to Idaho for a "briefing on the Coeur d'Alene situation." Pursuant thereto, Gardner met with Travis in Denver and was told that because of a factional dispute between Communist Party members of Mine-Mill in Coeur d'Alene he was to "remain aloof" from Party activity until further notified. Travis stated that he felt assured that the dispute would be resolved by the expulsion of the leader of the faction opposing the Party regional officers and instructed Gardner that once the problem was resolved he would be contacted by someone whom Travis would identify to him beforehand and that at that time Gardner could reactivate himself in the Party.

In August 1953, witness Mason had a conversation with Travis in Butte, Montana, in which he accused appellant and his Communist Party associates of trying to undermine the leadership of Mine-Mill District Number 1 while they were in the midst of a bargaining conflict with employers. Mason stated that he was aware that this was done because the District 1 leadership opposed Communist domination of Mine-Mill, that some of the men in Montana were very angry about the situation and that he was addressing himself to Travis as the leader of the Party in the Union. Appellant made no denials but suggested that he would like to take the matter up with the "boys in Denver." He suggested that Mason meet him in a few days in Denver to talk things over. In compliance Mason met Travis in Denver and again expressed his opposition to various activities in Mine-Mill including his view that the Union paper constantly criticized the foreign policies of the United States without once

attacking the position of the Soviet Union. Travis answered that Mason's position was in direct opposition to the Party and that he was not being realistic if he thought appellant could change the policies of the paper. Appellant continued, stating that the Communist Party leadership in Mine-Mill felt that there should be no compromises "and that he, Travis, is one of those in the Party who thinks that there have been too many compromises already, that [Mason did] not grasp the new situation, that the Soviet Union is becoming stronger, and that the position of the Communists in the Union has been stronger, we have been able to, he said, repulse the raid and hold this union and other unions." Mason threatened an open fight on the Communist issue and Travis pointed out that he would have seasoned fighters, the machine and the paper, to use against Mason in such a fight. Travis then concluded the conversation by telling Mason: "You and Joe [Mason's brother] were invited to get into the Party, had you done so, you would be sitting high in the councils of this organization with us, but you failed to do so."

■ Many of the points raised in appellant's brief were considered by this court in the recent case of Sells v. United States, 10 Cir., 262 F.2d 815, and need not again be treated at length. As to the evidentiary questions involved, the Sells case stands for the proposition that prosecution under the false statements statute is not defeated by a temporary "resignation" for the purpose of signing the affidavits only. Evidence of active participation on a continuing basis both before and after the crucial time of signing and filing the affidavit is sufficient evidence from which the jury might infer that membership continued during the time in question.

■ Appellant has urged that the perjury rule of evidence must apply to convictions for false statements under Section 1001, 18 U.S.C.A., and that since the government's case is concededly circumstantial the evidence is legally insufficient to sustain the verdict, cf. Radomsky v. United States, 9 Cir., 180 F.2d 781; Spaeth v. United States, 6 Cir., 218 F.2d 361. However, in the Sells case, this circuit followed the view of the 7th and 9th circuits, that the court-established rule governing the quantum of evidence required in a prosecution for perjury, viz., falsity of the statement must be shown by the testimony of two independent witnesses or other corroboration, is inapplicable to a prosecution under Section 1001. United States v. Killian, 7 Cir., 246 F.2d 77; Fisher v. United States, 9 Cir., 231 F.2d 99; Fisher v. United States, 9 Cir., 254 F.2d 302; see also Hupman v. United States, 6 Cir., 219 F.2d 243. Hence, the trial court did not err in submitting the case to the jury without instructing in accordance with the perjury rule.

■ The evidence of Travis' continued membership in the Party stands uncontradicted. Appellant made no attempt to affirmatively rebut the government evidence on that issue nor did he introduce evidence of his purported resignation. Instead, his defense consisted primarily in extensive cross-examination of prosecution witnesses in an endeavor to impeach and discredit their testimony. He also introduced the testimony of character witnesses as to his reputation for truth and veracity. Of course, the absence of rebutting evidence in no way relieves the government from meeting the burden of proof. Nevertheless, it is a fundamental principle of appellate review in criminal cases that once the jury has concluded, as it did here, that the guilt of the accused was proven beyond a reasonable doubt, it is not the province nor the function of this court to weigh the evidence or to test the credibility of witnesses. United States v. Green, 7 Cir., 246 F.2d 155. Furthermore, we are limited in the scope of our review to a determination of whether there is substantial evidence to support the verdict, Wilcoxon v. United States, 10 Cir., 231 F.2d 384, and must view the evidence in the light most favorable to the government, Evans v. United States, 10 Cir., 240 F.2d 695. With these

principles in mind, a careful review of the voluminous record persuades us that the jury verdict is amply sustained by cumulative proof that appellant's Communist Party membership was not severed by the purported resignation and that he was a Party member on the dates crucial to this decision.

■ There is no necessity to consider the sufficiency of the evidence under the "affiliation" counts of the indictment because no fines were imposed thereon and the prison sentences on those counts were made to run concurrently with the prison sentences of the "membership" counts. Lawn v. United States, 355 U.S. 339, at page 359, 78 S.Ct. 311, 2 L.Ed.2d 321; Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; Roviaro v. United States, 353 U.S. 53, at page 59, footnote 6, 77 S.Ct. 623, 1 L.Ed.2d 639.

■ Appellant contends, but without merit, that the statements of the affidavits, shown by the evidence and found by the jury to have been false at the time they were made, were not "material" because the Union did not utilize the N.L.R.B. procedures after recognition by the National Labor Relations Board. Recognition was granted the Mine-Mill as a result of the Travis filing among others, which indeed must have been his intent in filing, and the false statement was "capable of influencing, the decision of the tribunal in making a determination required to be made," Weinstock v. United States, 97 U.S.App.D.C. 365, 231 F.2d 699, 701. The materiality of the false statement is tested not by the Union's use of the N.L.R.B.'s facilities but by the Union's achievement thereby of a status which carries with it the right to invoke the benefit of the National Labor Relations Act. Sells v. United States, supra.

The government's witness Eckert testified that during the time that he was a member of the Communist Party, 1931 to 1948, it was the continuing policy of the Party "that once having joined the Communist Party you could not leave without being expelled." Defendant ob-jected to the introduction of the evidence, asserting that the testimony was based upon opinion unsupported by facts, that it was unconnected in time with the date of defendant's resignation in 1949 or the filing of the affidavits in 1951 and 1952, and that it was an attempt by the government to impute guilt by association.

Most assuredly, the evidence was probative of the second side of the question of membership, i. e. whether the Party was willing to accept the defendant and recognize him as a member, and hence admissible, but without more it could show nothing of the state of mind of the defendant and could not show that he did not, in fact, resign from the Party on the date he claimed. As was said by Judge Bazelon in a special opinion written in Gold v. United States, 99 U.S.App. D.C. 136, 237 F.2d 764, 772, reversed on other grounds 352 U.S. 985, 77 S.Ct. 378, 1 L.Ed.2d 360:

> "If no one can effectively resign from the Party, no union officer with appellant's history can ever comply with § 9(h) and the statutory phrase 'is not a member' is precisely equivalent to 'has never been a member.' This possibility Douds specifically rejects." See American Communications Association, C. I. O. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925.

■ Defendant sought to have given to the jury an instruction which could be understood to limit the purpose of the admission of this testimony, but the trial court ruled that, considered with other evidence in the record, the evidence was relevant and probative of whether or not defendant's resignation was a true resignation or a mere sham to obtain the benefits of the National Labor Relations Act for Mine-Mill. Upon this premise, counsel argued to the jury that numerous persons, including the government's witnesses, had left the Party, regardless of the Party's policy.

Whether or not the jury could properly infer from the related evidence that the defendant continued to act in obedi-

ence to this policy and that his resignation was understood to be in form only determines whether the court was correct in refusing to circumscribe its use by the jury. I Wigmore, Evidence, sec. 13.

In 1948, a meeting in New York City was held among persons of significance in the trade unions and the Communist Party [7] including the defendant and the government witness Eckert, who related what transpired. The National Trade Union Secretary of the Communist Party presided and stated that the purpose of the meeting was to determine whether or not Communist officials in the unions should be granted permission by the Party to sign the non-Communist affidavits. Despite speeches protesting that the unions were not appearing on election ballots because of lack of compliance with the law, it was decided that Communist Union men would not sign the affidavits. Travis' reaction to the decision was one of support and obedience. The Mine-Mill adopted the policy of not signing the non-Communist affidavits.

Subsequently, Travis told another government witness, Mason, that the Union was becoming more and more concerned because of the losses of elections and that the Communist Party had been again discussing whether the Communist Union officials should sign the affidavits. In a second conversation with Mason in July, 1949, Travis offered him a copy of his resignation statement, which was later published in the Union's paper, and said that the statement had been cleared with Ben Gold and the Party people in New York. He told Mason that "the Party thinks this is the best policy for us in the unions to follow."

In October, 1951, Travis had a conversation with the witness Gardner: " * * * we very briefly discussed his resignation from the Party in which he pointed out that he believed that resignation, that public resignation was a mistake because it gave the enemies of the Party an opportunity to use that in pointing out that his wasn't a true resignation from the Party, that actually it was done merely to conform to Taft-Hartley affidavits, and they recognized, the enemies of the Party recognized that this was not an actual resignation, * * *."

Thus the evidence of the Party's policy was relevant in the interpretation of the defendant's statements and behavior, and is not analogous to the prohibited imputation drawn from membership alone that a member endorses fully all of the precepts of the Party. Cf. Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796; Nowak v. United States, 356 U.S. 660, 78 S.Ct. 955, 963, 2 L.Ed.2d 1048; Maisenberg v. United States, 356 U.S. 670, 78 S.Ct. 960, 2 L. Ed.2d 1056.

The charge that Eckert's testimony on this point was opinion unsupported by facts going to the main issue results from a confusion in the record as to whether Eckert was testifying as an expert. Eckert's position of knowing what Party policy was during the time of his membership was shown through evidence similar to that customarily evoked to qualify an expert, but he testified as to a fact within his knowledge rather than giving an opinion as an expert.

The trial court did not instruct the jury that there was a presumption, in absence of contradicting evidence, either that the Party's policy of no resignations continued or that Travis' membership, having been admitted prior to the alleged resignation and inferentially shown subsequent to that time, continued during the time the affidavits were filed. The factual effect of the evidence was left to

7. In attendance besides Travis and Eckert, were William Z. Foster, National Chairman of the Communist Party, Eugene Dennis, General Secretary, Ben Gold, a member of the Central Committee and an official of the Fur Workers Union, John Williamson, National Trade Union Secretary of the Communist Party, Arnold Johnson, Ohio State Secretary of the Party, and officials of the Farm Equipment Union, Furniture Workers Union and Electrical, Radio, and Machine Workers Union.

the jury. That body might well have drawn an inference unfavorable to appellant. See Jencks v. United States, 5 Cir., 226 F.2d 540, 547, reversed on other grounds 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103.

Appellant urges that Eckert's testimony was remote, irrelevant and inflammatory because early in the proceedings defense counsel offered to stipulate that Travis had been a Party member from 1941 to August 1949 and Eckert could show no more than an adherence to Party principles until 1948. Since a man's state of mind must necessarily be shown from his statements and conduct, the prosecution bore the burden of demonstrating a continuation of activities and attitudes similar to those performed and held by Travis during the time of his admitted membership after the date of his purported resignation. The evidence of how extensively, actively and zealously Travis had worked as a Party member and his leadership in the Party was clearly relevant to the question of whether or not the resignation was a mere pretense. If it is true that evidence of Communist Party activities has a tendency to provoke present-day juries toward prejudice, it is ridiculous to suppose that the attitude of the public against a crime will prevent its prosecution. If the evidence has probative value, it is ordinarily admissible regardless of an imagined reaction of the jury, Suhay v. United States, 10 Cir., 95 F.2d 890.

Appellant insists that the trial court improperly restricted his cross-examination of prosecution witnesses by not allowing him to show that witness Mason was a government informant through fear of deportation and that Eckert and Gardner were members of a labor organization with rival interests to those of Mine-Mill. As to Mason, the evidence showed that he had been a member of the Communist Party for a brief period in the early 1930's. In cross-examining Mason, defense counsel elicited the information that he had become a naturalized citizen in 1938 and that prior to his naturalization the United States Immigration and Naturalization Service had questioned him about his past Party membership. The defense then asked Mason if he was again questioned by that Service about the same matter in 1952. The government objected to the question as improper cross-examination and counsel were heard in chambers. The defense argued that it wanted to show that the witness had an interest in testifying. Counsel suggested that Mason knew that Congress passed the McCarran Act providing for deportation of aliens on grounds of past membership in the Communist Party and asserted that it sought to elicit evidence that government agents had held out promises or threats to Mason to induce him to testify. The government insisted that the purpose of the defense was merely to embarrass the witness. The court then addressed defense counsel as a member of the Bar of the Court and asked if he knew of anything which would substantiate the charge. Defense counsel responded that he had no knowledge of promises or threats but said he had been informed that during the pertinent period the witness was very concerned about his status as an alien and was "going around asking people questions" about it. The court then sustained the government objection stating that it did not think the inference that there were threats or promises was warranted.

Cross-examination of a witness is a matter of right, The Ottawa, 3 Wall. 268, 271, 18 L.Ed. 165, and cannot be circumscribed by the courts where the questions propounded are within the framework of his testimony on direct examination, except to the extent the witness himself claims privilege or constitutional protection. However, the demonstration of a witness' bias almost always requires a search of his conduct and the circumstances of his situation, which facts may be irrelevant to the issues at trial but important to the litigants as a safeguard against false or colored testimony. III Wigmore, Evidence, § 943. Prolonged digressions from the matters at hand for the pur-

pose of exploring the manners and morals, hopes and fears, beliefs and conflicts of a personality whose connection with the trial occurs merely because of his position as a spectator can as readily abort the process of justice as can a denial of the right of cross-examination. Thus, it has long been held that the scope of cross-examination seeking to discredit the witness may be reasonably limited by the court responsible for the trial of the case. In Blitz v. United States, 153 U.S. 308, 312, 14 S.Ct. 924, 925, 38 L.Ed. 725, where a question seeking to impeach a deputy marshal was not permitted, the court stated:

"The question was clearly irrelevant, and was properly excluded. The reasons, whatever they may have been, that induced the witness not to arrest the defendant when the latter voted the second time in the same election, did not throw any light upon the issue to be determined. If the object was to test the accuracy or credibility of the witness, it is quite sufficient to say that the extent to which a cross-examination may be allowed for such a purpose—especially where, as in this case, the question had no reference to any matter disclosed by the examination-in-chief—is largely subject to the sound discretion of the trial court, and the exercise of that discretion is not reviewable upon writ of error; certainly not where the question, upon its face, suggests nothing material to the inquiry whether the defendant is guilty or not guilty of the specific offense charged in the indictment."

Certain classes of facts such as family relationship to a party have been held to so strongly give rise to inferences relevant to the witness' interest and bias as to leave no room for an exercise of discretion in admissibility. III Wigmore, Evidence, § 948. Among these always admissible circumstances is the fact that the witness for the prosecution is under indictment or in custody at the time of trial, Alford v. United States, 282 U.S.

687, 51 S.Ct. 218, 75 L.Ed. 624; District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843. But these cases do not govern the situation of the witness Mason in the present case and, in fact, reaffirm the view of the Blitz case that, in the absence of an abuse of discretion, the decision of permitting or excluding extrinsic evidence for impeachment purposes rests with the trial judge. As stated by Professor Wigmore, new circumstances will constantly be presented as suggestive of personal prejudice and the trial court must determine whether from the conduct, language or circumstances of the witness a palpable hostility to one party or sympathy for the other is inferable.

The inference that the witness Mason was coercively influenced to testify by a power over him held by immigration officials requires imagination to be applied in disparagement of facts appearing in the record. Mason is a naturalized citizen, not an alien subject to deportation. If wild surmise permit the deduction that he had committed a fraud in his application for citizenship by concealing his membership in a subversive group, which might be used to return him to an alien status, such conjecture is dispelled by his revelations to the Service in 1938. Therefore, we find no abuse of discretion on the part of the trial court in excluding the question as to the witness' more recent contacts with immigration officials.

As to the cross-examination of Eckert and Gardner, appellant urges that it was error for the trial court to sustain objections to questions concerning alleged rivalries between Mine-Mill and the labor organization then employing those two witnesses. The trial court in ruling on the matter expressed the view that any possible inference that could be drawn from a showing of such rivalry would be too remote to be relevant. In arguing that this was error, appellant cites authorities for the proposition that it is within the proper scope of cross-examination to show that the

witness is testifying for his employer,[8] that his employer has an interest in the recovery,[9] is employed by the law firm representing the party for whom he testifies,[10] or when his employer is a business competitor of the party against whom he testifies.[11] He also cites a decision of this court to the effect that it is proper to probe the employment of a witness where he is an adjuster for a group of fire insurance companies, possibly interested in the suit, where the action sought damages for negligent installation of a furnace.[12] However, none of those cases has gone so far as appellant asks that we go here. Each of those cases was a civil action in which the employer had some interest in the outcome of the suit. But this is a criminal

action and it is brought against Travis, not against Mine-Mill. What appellant asks is that he be allowed to show rivalry between the Unions in order to impute prejudice against Mine-Mill to the witness and then asks the jury to infer therefrom bias against Travis. It is not reversible error to restrict cross-examination questions having only a slight and indirect bearing on the bias and credibility of a witness. District of Columbia v. Clawans, supra. The trial court correctly ruled that the evidence was too remote to be admissible.

■ Appellant next complains of the instructions to the jury concerning the meaning of membership in and affiliation with the Communist Party.[13] He argues

8. Central Truck Lines, Inc. v. Lott, 5 Cir., 249 F.2d 722.

9. Majestic v. Louisville & N. R. Co., 6 Cir., 147 F.2d 621.

10. Lexington Glass Co. v. Zurich General Acc. & Liability Ins. Co., Ky.App., 271 S.W.2d 909.

11. Manley v. Northumberland County, D.C. M.D.Pa., 32 F.Supp. 775.

12. Theurer v. Holland Furnace Co., 10 Cir., 124 F.2d 494.

13. The trial court instructed the jury as follows:

"Whether or not the defendant was a member of the Communist Party at the times alleged in the indictment is a question of fact which you are to determine from all of the evidence in the case. In determining this question you must bear in mind that the burden of proof rests on the Government to prove the defendant guilty beyond a reasonable doubt. Membership or lack of membership in the Communist Party may be established by direct as well as circumstantial evidence.

"Membership in the Communist Party, the same as membership in any other organization, constitutes the state of being one of those person(s) who belong to or comprise the Communist Party. It connotes a status of mutuality between the individual and the organization. That is to say, there must be present the desire on the part of the individual to belong to the Communist Party and a recognition by that Party that it considers him as a member.

"Intent is a state of mind and can only be determined by what an individual says and what he does. In determining the issue as to whether the defendant was or was not a member of the Communist Party at the times alleged in the indictment, you may take into consideration the acts and statements of this defendant, as disclosed by the evidence, bearing in mind that individual and unrelated isolated acts of the defendant showing cooperation with the Communist Party or isolated statements of the defendant showing sympathy with the Communist Party are not in themselves conclusive evidence of membership but are circumstances which you may take into consideration along with all the other evidence in this case.

"In determining whether or not the defendant was a member of the Communist Party at the times alleged in the indictment, you may take into consideration whether the defendant: 1. Has made himself subject to the discipline of the Communist Party in any form whatsoever; 2. Has executed orders, plans, or directives of any kind of the Communist Party; 3. Has acted as an agent, courier, messenger, correspondent, organizer, or in any other capacity in behalf of the Communist Party; 4. Has conferred with officers or other members of the Communist Party in behalf of any plan or enterprise of the organization; 5. Has been accepted to his knowledge as an officer or member of the Communist Party or as one to be called upon for services by other officers or members of the organization; 6. Has written, spoken or in any other way communicated by signal, semaphore, sign,

that the definition of "membership" used by the court was so all embracing and vague as to be meaningless destroying as a consequence any distinction between "membership" and "affiliation." We see no substance to this contention. In charging the jury with respect to the components of Communist Party membership and affiliation the trial court carefully followed the directions of this court expressed in the opinion on the first appeal.[14] The instructions were meaningful and clear. They included 11 of the 14 indicia of membership outlined by Congress in Section 5 of the Communist Control Act of 1954 (50 U.S.C.A. § 844) and emphasized the primary element of membership as suggested by Mr. Justice Burton in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1019, 1 L.Ed. 2d 1103, that there must be present "the desire of an individual to belong to the

or in any other form of communication orders, directives, or plans of the Communist Party; 7. Has prepared documents, pamphlets, leaflets, books, or any other type of publication in behalf of the objectives and purposes of the organization; 8. Has mailed, shipped, circulated, distributed, delivered, or in any other way sent or delivered to others material or propaganda of any kind in behalf of the organization; 9. Has advised, counseled or in any other way imparted information, suggestions, recommendations to officers or members of the Communist Party or to anyone else in behalf of the objectives of the organization; 10. Has indicated by word, action, conduct, writing or in any other way a willingness to carry out in any manner and to any degree the plans, designs, objectives, or purposes of the organization; 11. Has in any other way participated in the activities, planning, actions, objectives, or purposes of the organization.

"These are some of the indicia of Communist Party membership but you are not limited solely to those I have enumerated. As sole arbiters of the facts it is your duty to consider all the evidence either direct or circumstantial which bears upon the question of whether or not the defendant was a member of the Communist Party on the dates alleged in the indictment.

"In determining this question, you must bear in mind that the burden of proof rests upon the Government to prove the defendant guilty beyond a reasonable doubt. If you find that the Government has sustained this burden by proving beyond a reasonable doubt, that the defendant was a member of the Communist Party on December 19, 1951, and December 3, 1952, as alleged in the indictment, and if you find also that the Government has proved beyond a reasonable doubt the other essential elements of the offense charged in the first and fourth counts of the indictment, as I have outlined them to you, then you must find the defendant guilty as to the first and fourth counts.

"If, however, you find that the Government has not sustained the burden of proving beyond a reasonable doubt that the defendant was a member of the Communist Party on the dates alleged in the indictment, then you must find him not guilty as to the first and fourth counts.

" 'Affiliation' as used in the second and fifth counts of the indictment is not the same as membership. The word 'affiliated,' as used in the second and fifth counts of the indictment, means a relationship short of and less than membership in the Communist Party, but more than that of mere sympathy for the aims and objectives of the Communist Party.

"A person may be found to be 'affiliated' with an organization, even though not a member, when there is shown to be a close working alliance or association between him and the organization, together with a mutal understanding or recognition that the organization can rely and depend upon him to cooperate with it, and to work for its benefit, for an indefinite period upon a fairly permanent basis.

" 'Affiliation' includes an element of dependability upon which the organization can rely which, though not equivalent to membership duty, does rest upon a course of conduct that could not be abruptly ended without giving a reasonable cause for the charge of a breach of good faith.

"Whether or not the defendant was affiliated with the Communist Party at the time alleged in the indictment is a question of fact which you, ladies and gentlemen, are to determine from all the evidence in the case. Affiliation or lack of affiliation in the Communist Party may be established by direct as well as circumstantial evidence." (Record 1228–1230.)

14. 247 F.2d 130, at pages 135 and 136.

organization and a recognition by the organization that it considers him as a member." This adequately outlined the kind of acts that could be considered evidence of membership and included the idea of the continuing reciprocal relationship necessary for that status.

The jury was told that Travis' membership in the Communist Party at the times alleged in the indictment was to be determined from "all the evidence in the case" and that they were not limited solely to consideration of the indicia of membership enumerated by the court. However, this in no way indicates, as appellant contends, that the jury was told it was free to consider anything in evidence as proof of membership. The court went on to clarify: " * * * it is your duty to consider all the evidence * * * *which bears upon the question of whether or not the defendant was a member of the Communist Party on the dates alleged in the indictment."* (Emphasis added.) Furthermore, it must be presumed that the jury, after such careful instructions on the components of membership, is perfectly capable of separating evidence which tends to prove membership from evidence which does not. Appellant also argues in this connection that the instructions left the jurors free to use single items of evidence standing alone as the basis for their findings. Such was not the case. They were instructed that isolated acts or statements were circumstances they could consider, but were cautioned that these were not in themselves conclusive proof of membership and were only to be considered in connection with the other evidence, that they were to weigh all the evidence bearing on the crucial issues, and that the government retained the burden of proving guilt beyond a reasonable doubt.

Nor is there any merit to the contention that the jury was left free to infer membership at the time of signing the affidavits from appellant's past Party membership or from the conclusion that the resignation was not honest. The instructions clearly contravene this argument:

"The crucial issue of fact in this case is whether on December 19, 1951, and December 3, 1952, Maurice E. Travis was or was not then a member of the Communist Party or affiliated with such party.

"The affidavits do not call upon any person to state whether or not in the past he has ever been a member of the Communist Party or affiliated with it. A person who has been at some time in the past either a member of the Communist Party or affiliated with that Party but who has terminated such membership or affiliation prior to the making of the affidavits would be entitled to sign the affidavits under oath without violating the law.

"Since the affidavits speak in the present tense only, the fundamental issue of fact for you to decide is whether or not at the times alleged in the indictment the defendant knowingly and wilfully used an affidavit which was false and which he knew to be false at that time.

\* \* \* \* \* \*

"You may not presume the existence of a fact and then infer from such presumed fact the existence of any other fact or circumstance. You may not infer from any presumed fact or facts that the defendant is guilty of any of the offenses charged in the indictment."

It is urged that the trial court should have clarified what bearing the pre-affidavit and post-affidavit evidence had on guilt and that it should have pointed out which evidence was relevant to each affidavit. We do not agree. The court should not be required to emphasize particular portions of the evidence. To require trial courts to suggest to the jury the inferences which may be drawn from the evidence would be to invite error. Radius v. Travelers Ins. Co., 9 Cir., 87 F.2d 412. Further, it would be an invasion of the province

of the jury to judicially measure the weight of circumstances which the jury can determine equally as well. Majestic v. Louisville & N. R. Co., 6 Cir., 147 F.2d 621.

Further error is alleged in the refusal of the court to give several requested instructions. We shall not lengthen this opinion by discussing appellant's many contentions in this regard. It is sufficient to say that the instructions given to the jury were complete and proper. Moreover, the jury was admonished with particularity as to all the safeguards that should properly surround a criminal prosecution. The rejected instructions added no proper charge which was not covered by those actually given and there was no error in refusing to give them.

After each of the government witnesses had testified on direct examination at the trial, appellant moved that the prosecution be required to produce all reports and statements previously made by those witnesses to any agent of the government as provided under 18 U.S.C.A. § 3500. The motions were granted but since the government claimed that the statements of each witness contained matter not related to the subject matter of his testimony as a witness, the trial court, pursuant to Section 3500(c), examined the statements *in camera* and excised the unrelated matters before delivering them to appellant.

■■ Appellant's claims anent the constitutionality of section 3500 were examined fully in the Sells case, supra. Inasmuch as the availability to the defense of documents held by the government is limited under the decision of Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, and Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, to matters relevant to the testimony of a witness for the prosecution, Section 3500 merely provides the procedure by which that relevancy may be determined and deprives the defendant of nothing to which he was formerly entitled. Of course, the excised portion of a statement must be available for review to test the correctness of the trial court's judgment in eliminating it from consideration by the defense.

The United States Supreme Court has held in recent decisions, Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 and Rosenberg v. United States, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 that Section 3500 is constitutional and governs the rights of a defendant to the production of documents in the hands of the prosecution. Further, the court approved the *in camera* inspection by the trial court as the proper procedure to be followed in determining the application of the statute to the particular statements sought by the defense. We have carefully examined and compared the complete documents and the documents as they were submitted finally to the defense and conclude that the only excised portions related to matters and persons not connected with the present case.

Counsel for appellant has skillfully anticipated a great many problems which will yet arise before the administration of Section 3500 is stabilized by precedent. Most of these problems are not made ripe for decision under the present case.

Appellant suggests that the trial court delegated to the prosecution its responsibility for the determination of whether or not certain documents contained "statements" within the purview of Section 3500(e) which should be made available to the defense. He contends that if the prosecution determines that no part of a statement relates to the subject matter or, if it does, that it is not a "statement" as defined in subsection (e), then the trial court never inspects the statement at all and it is not preserved for the record. "There is appellate review if only part of a document is withheld from the defense; none, if the entire document is withheld." This problem was foreseen by the United States Supreme Court in the Palermo case, supra, and the production by the government of doubtful writings and in camera determination of the subject matter and whether it comes

within the definition of "statement" of subsection (e) was approved. This ruling, however, does not aid appellant for the record shows merely that the three witnesses, Eckert, Mason, and Gardner, had talked with government attorneys in preparation for this case and that Eckert had talked to an investigator for a congressional committee. The subject of these conversations was Travis and Mine-Mill, but there is nothing in the record to indicate that these witnesses had in these instances written, signed, adopted or approved any writing or that any recording was made of any oral statement made to these agents. It is presumed that these agents took notes or made summaries of their conversations with the witnesses but such interpretations would not be "statements which could properly be called the witness' own words," Palermo v. United States, and the witnesses denied signing or adopting any such statements.

Appellant moved for the production of the witnesses' testimony before one or more grand juries. The theory that either the Jencks decision, Jencks v. United States, supra, or the Jencks Act, Section 3500, encompasses grand jury testimony was discarded in Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323. Unlike the appellant in that case, however, appellant here moved the court for inspection of the grand jury minutes as a matter or right and alternatively to have the minutes produced for the court's examination and determination whether inconsistencies appeared between the witness' testimony before the grand jury and his testimony at trial.

Thus, the question here is the one particularly left undecided by the Pittsburgh Plate Glass case: Whether the trial court may, in the discretion granted him under Rule 6(e), Fed.Rules Crim. Procedure, 18 U.S.C.A., refuse to examine the transcript of the grand jury when requested to do so. Rule 6(e) provides:

"Disclosure of matters occurring before the grand jury other than its

269 F.2d—60

deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter or stenographer may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. * * * "

It has been held that instances when the need for disclosure of grand jury proceedings outweighs the countervailing policy maintaining the secrecy of such proceedings must be shown with particularity, United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077. The burden is on the defense to show that "a particularized need" exists for the minutes which outweighs the policy of secrecy, Pittsburgh Plate Glass Co. v. United States, supra. Thus, where some portion of a defendant's testimony was impeached by the government's use of her grand jury testimony, it has been held that the trial court should make an inspection of all of her testimony for the purpose of disclosing other inconsistencies to the use of a co-defendant, United States v. H. J. K. Theatre Corporation, 2 Cir., 236 F.2d 502, but this is a far cry from requiring a trial court to examine all of the testimony of all of the witnesses for the prosecution upon the defense's hope of thereby uncovering some inconsistency. In view of prior statements of these witnesses made available to the defense, in which there appeared no suggestion of material inconsistency, it is unlikely that their statements to the grand jury occurring at a time between the giving of such statements and consistent statements upon trial would produce impeaching material. Appellant shows inaccuracies in the testimony of the witnesses (i. e. Gardner thought he had testified in

another case the prior week but actually it was two weeks earlier; Eckert had testified on seven previous occasions against Mine-Mill but his testimony as to details was not precisely the same on each occasion; Gardner's evidence at trial was not shown on the reports which he made to the F.B.I.; Mason stated to the F.B.I. that he was "unable to enlarge" on information about appellant, but at trial gave other specific information); these inaccuracies might well give rise to argument concerning the witnesses' memories and powers of observation which were available to the defense from the materials produced by the government. They do not demonstrate a reason for believing that the witnesses' testimony was biased or impeachable on material fact. They do not compel the conclusion that the testimony before the grand jury requires further investigation.

 Since the permission or refusal of a defense inspection of grand jury minutes rests in the discretion of the trial court, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, and since no showing was made of a particularized need for the grand jury minutes in the maintenance of the defense, Pittsburgh Plate Glass Co. v. United States, supra, we hold that the trial court did not abuse its discretion in failing to order the production of grand jury minutes in this case where difficulties have arisen not from the paucity of evidence but from its plethora.

Affirmed.

MURRAH, Circuit Judge (dissenting).

In the first place, I would apply the perjury rule for the reasons so well stated by Judge Bazelon in Gold v. United States, 99 U.S.App.D.C. 136, 237 F.2d 764. As in that case, the charge is false swearing, the evidence is indeed indirect and circumstantial, and in my judgment inconclusive. The only reason assigned for the inapplicability of the ancient and accepted perjury rule requiring direct and positive evidence of guilt, is that in cases of this kind, its application would "merely thwart the attainment of the end which Congress sought to accomplish by the enactment of Paragraph 9(h)." See Sells v. United States, 10 Cir., 262 F.2d 815. But there is nothing in the legislative history of Section 9(h) to indicate that the Congress entertained the view that the perjury rule was inapplicable to prosecutions under Section 1001, as in Section 1621. See Judge Bazelon in the Gold case, Note 17. While feeling myself bound by the pronouncements of my court in the Sells case, I cannot refrain from expressing the hope that such is not the law in cases of this kind.

I would reverse this case and remand it for a new trial for the refusal of the trial court to examine the grand jury evidence in camera, to determine whether the lid of secrecy ought to be lifted in the interest of the proper administration of criminal justice. We know that grand jury testimony may be disclosed only upon a showing of a particularized need, and the burden of showing that need is on the one seeking it. But if the rule is to have any efficacy, its burdens ought not to be insurmountable.

How then may the accused lay a foundation for requisite inconsistency when he does not have access to the testimony or any other means except cross-examination in the hope that something will turn up? In our case the cross-examination of the prosecuting witnesses disclosed that they had testified in numerous cases of this kind, as well as before the grand jury which had indicted the accused. There were some inconsistencies in the testimony they had given in other open proceedings. But there was no conceivable way of showing a particularized need unless the accused could get the grand jury testimony before the court.

It is for these reasons that we have committed to the trial court the judicial function of determining ex parte whether the testimony of the witnesses is substantially consistent. And, the court cannot exercise that important function unless he knows something of the witnesses' testimony. It would seem therefore that the trial court erroneously and

prejudicially refused to take a judicial look at the grand jury testimony. Cf. United States v. Spangelet, 2 Cir., 258 F.2d 338. It may be that we would be justified in having the grand jury testimony certified for examination here, as was done in United States v. Lev, 2 Cir., 258 F.2d 9. Unless it is done, I certainly can't say that it was harmless error to refuse to look at it.

This case is important, not only to the accused here, but as a guiding precedent in other cases. I do not believe we can dispose of the question by simply saying that it was harmless.